**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SCOTT K. KELLER,**<br><br>**Plaintiff,**<br><br>**-v.-**<br><br>**EXXONMOBIL OIL CORPORATION**<br><br>**Defendant.** | **Case No.: 1:23-cv-01528**<br><br>**Admiralty**<br><br>**Jury Trial Demanded** |

**<u>PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT EXXONMOBIL OIL CORPORATION's MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ..... 1

STANDARD OF REVIEW ..... 2

STATEMENT OF FACTS AND ARGUMENT ..... 3

A. FACTUAL BACKGROUND ..... 3

B. THE JONES ACT ..... 3

C. MARITIME EXPOSURE TO ASBESTOS, IN GENERAL AND IN SPECIFIC TO MR. KELLER ..... 7

1. The United States Coast Guard has Detailed Exposure to Asbestos for Engine Room Workers like Mr. Keller. ..... 7

2. Mr. Keller's Coworkers Detailed Mr. Keller's Specific Exposure to Asbestos on the Defendant's Ships. ..... 10

3. Mr. Keller's Deposition Testimony Regarding Exposure to Asbestos. ..... 15

4. Defendant Never Warned or Protected its Workers Against Any Toxic Hazards. ..... 17

5. Defendant's Negligence Specifically Caused Mr. Keller's Lung Cancer. ..... 21

6. Defendant's Attacks on Plaintiff's Experts Go To the Weight of Their Opinions, Not Their Sufficiency. ..... 23

CONCLUSION ..... 24

## TABLE OF AUTHORITIES

**Cases**

*American Dredging Co. v. Miller*,
510 U.S. 443 (1994) ..... 4

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..... 2

*Badamo v. Chevron U.S.A. Inc.*,
602 F. Supp. 3d 646 (S.D.N.Y. 2022) ..... 7

*Brogan v. United New York Sandy Hook Pilots' Ass'n*,
213 F. Supp. 2d 432 (D.N.J. 2002) ..... 4

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..... 2

*Consol. Rail Corporation v. Gottshall*,
512 U.S. 532 (1994) ..... 4

*Evans v. United Arab Shipping Co. S.A.G.*,
4 F.3d 207 (3d Cir. 1993) ..... 4

*Ferguson v. Moore-McCormack Lines, Inc.*,
352 U.S. 521 (1957) ..... 4

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ..... 2

*Norfolk Southern Railway Co. v. Sorrell*,
549 U.S. 158 (2007) ..... 4

*Pehowic v. Erie Lackawanna Railroad Co.*
430 F.2d 697 (3rd Cir. 1970) ..... 6

*Reeves v. Sanderson Plumbing Prods.*, Inc.,
530 U.S. 133 (2000) ..... 2

*Ricci v. DeStefano*,
557 U.S. 557 (2009) ..... 2

*Rogers v. Missouri Pacific R. Co.*,
352 U.S. 500 (1957) ..... 4, 5, 6

*Scott v. Harris*,
550 U.S. 372 (2007) ..... 2

*Sloan v. United States of America*,
603 F.Supp. 2d 798 (E.D. Pa. 2009) ........................................................................ 4

*Southard v. Independent Towing Co.*,
453 F.2d 1115 (3d Cir. 1971)........................................................................... 5, 6

*Torgerson v. City of Rochester*,
643 F.3d 1031 (8th Cir. 2011) (en banc) ................................................................ 2

*Torrejon v. Mobil Oil Co.*,
876 So. 2d 877 (La. Ct. App. 2004)........................................................................ 6

*Wabun-Inini v. Sessions*,
900 F.2d 1234 (8th Cir. 1990) ............................................................................... 2

**Statutes**

46 U.S.C. § 30104............................................................................................ 3, 4

**Rules**

Fed. R. Civ. P. 56 .................................................................................................. 2

## INTRODUCTION

Defendant asserts that Plaintiff, Mr. Keller, was never exposed to asbestos onboard Defendant's vessels. This is not accurate. The testimony of Mr. Keller's coworkers firmly establishes that Mr. Keller was indeed exposed to asbestos. Defendant, as the Jones Act employer of Plaintiff, breached its duties owed to Mr. Keller by, including but not limited to, failing to warn him of the dangers of exposure to asbestos, failing to provide Mr. Keller with a reasonably safe workplace and personal protection equipment, failure to exercise reasonable care with respect to exposing Mr. Keller to asbestos, and otherwise failing to act in a reasonable and prudent manner. Plaintiff's Complaint, **Exhibit 1** to Clark Decl. at ¶¶21, 31.

Additionally, Defendant contends that Plaintiff's specific causation evidence is lacking because Plaintiff's experts, allegedly, cannot quantify the amount of respirable asbestos fibers that Mr. Keller inhaled while working for Defendant. This assertion is not supported by the facts or the law applicable in this Jones Act case. The evidence will show that Plaintiff has adequately met his burden, under the relevant summary judgment standard, to show that Defendant's negligence specifically caused Mr. Keller's lung cancer. As such, summary judgment is inappropriate.

Finally, it should be noted that much of what Defendant argues in its brief actually goes towards asking this Court to weigh the evidence, not attacking its sufficiency under the proper standard. The vast majority of Defendant's motion centers on Plaintiff's experts' opinions. Simply put, Defendant does not like what these experts say or the bases for their opinions. These are not proper grounds for granting summary judgment. The trier of fact is best able to resolve these issues regarding the parties' experts' opinions.

WHEREFORE, Plaintiff respectfully requests the Court to deny Defendant's motion for summary judgment in its entirety.

## **STANDARD OF REVIEW**

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact *and* that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis added). The movant bears the initial responsibility of informing the district court of the basis for its motion and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Only if the movant meets its threshold burden does the nonmovant then need to come forward with "specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986)).

Once the parties have met their respective burdens, the district court's task is to view the facts "in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Ricci v. DeStefano*, 557 U.S. 557 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci*, 557 U.S. 557 (quoting *Matsushita*, 475 U.S. at 587). Thus, summary judgment remains a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries. *Wabun-Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir. 1990).

## STATEMENT OF FACTS AND ARGUMENT

### A. FACTUAL BACKGROUND

Plaintiff Scott Keller graduated high school in 1969. Keller Deposition, attached as **Exhibit 2** to Clark Decl. at 43:1-4. He then obtained a diploma from the Maine Central Institute the following year. *Id*. at 43:20-45:1. After that, Mr. Keller sought additional schooling at the Maine Maritime Academy. *Id*. at 45:2-10. He matriculated at the Academy from 1970-1974. *Id*. at 45:8-10. He graduated with an engineering degree and immediately went to work for the Defendant in 1974. *Id*. at 60:18-61:19. For the next decade, Mr. Keller worked for the Defendant in the engineering department as an engineer. Clark Decl., **Exhibit 1** at ¶9.

Mr. Keller was repeatedly exposed to asbestos during his employment with Defendant. Furthermore, contrary to Defendant's statements in its brief, Defendant never warned its employees about the dangers of asbestos exposure (despite knowing of those dangers), never protected its employees from exposure to asbestos, and never provided a safe workspace for its employees.

Because of Defendant's negligence, Mr. Keller, a non-smoker, contracted lung cancer in March of 2020. *Id*. at ¶¶ 7-8. Plaintiff then sought redress for his injuries in this Court. Clark Decl., **Exhibit 1**.

### B. THE JONES ACT

Defendant has challenged that Mr. Keller was exposed to asbestos onboard its ships such that liability under the Jones Act attaches. It is important to review the elements in a Jones Act case in order to understand the type of evidence necessary to overcome Defendant's motion.

Codified in 46 U.S.C. § 30104, the Jones Act provides seamen a right of action in negligence against an employer for injuries sustained in the course of employment. The Jones Act extends to seamen the same statutory recovery for personal injury afforded to railroad workers

under the Federal Employer's Liability Act ("FELA"). *American Dredging Co. v. Miller*, 510 U.S. 443, 456 (1994). The Jones Act provides in relevant part:

> A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section.

46 U.S.C. § 30104 (supp. 2011).

It is well-established that the burden of proof to establish causation under FELA, and by incorporation, the Jones Act, is "relaxed" or "featherweight"—that is, liability attaches if the defendant's negligence played any part, no matter how slight, in causing the plaintiff's injury. *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 506 (1957) ("the test of a jury case is simply whether the proofs justify with reason the conclusion **employer negligence played any part, even the slightest**, in producing the injury or death for which damages are sought") (emphasis added); *see also Consol. Rail Corporation v. Gottshall*, 512 U.S. 532, 543 (1994) (acknowledging that "a relaxed causation standard applies under FELA"); *Norfolk Southern Railway Co. v. Sorrell*, 549 U.S. 158, 178 (2007) (Ginsburg, J., concurring) ("Today's opinion leaves in place precedent solidly establishing that the causation standard in FELA actions is more 'relaxed' than in tort litigation generally."); *Ferguson v. Moore-McCormack Lines, Inc.*, 352 U.S. 521, 523 (1957) (applying FELA's relaxed standard of causation to Jones Act cases); *Evans v. United Arab Shipping Co. S.A.G.*, 4 F.3d 207, 219 (3d Cir. 1993) (describing the plaintiff's standard of causation in Jones Act cases as "featherweight"); *Sloan v. United States of America*, 603 F. Supp. 2d 798, 805 (E.D. Pa. 2009) (holding the "featherweight causation standard [] allows a seaman to survive summary judgment by presenting even the slightest proof of causation.") (quoting *Brogan v. United New York Sandy Hook Pilots' Ass'n*, 213 F. Supp. 2d 432, 437 (D.N.J. 2002)).

The relaxed standard of proof adopted under *Rogers* and its progeny was specifically intended to reduce the injured employee's burden of establishing a case under traditional proximate cause standards. Indeed, the Court in *Rogers* noted that by enacting a statutory method of recovery under FELA, it was the intent of Congress to supplant the common-law issue of "duty" between master and servant "with the far more drastic duty of paying damages for injury or death at work due in whole or in part to the employer's negligence." 352 U.S. at 507. Based upon the public policy considerations underlying Jones Act and FELA claims, courts held the issue of employer negligence is normally a determination resting within the province of the jury. In *Rogers*, the Supreme Court stated the following in regard to the court's limited role in determining whether the evidence presented by a plaintiff is sufficient to create a question of fact for the jury as to employer negligence:

> Judicial appraisal of the proofs to determine whether a jury question is presented is **narrowly limited to the single inquiry** whether, with reason, **the conclusion may be drawn that negligence of the employer played any part at all in the injury or death**. Judges are to fix their sights primarily to make that appraisal and, **if that test is met, are bound to find that a case for the jury is made out** whether or not the evidence allows the jury a choice of other probabilities. The statute expressly imposes liability upon the employer to pay damages for injury or death due in whole or in part to its negligence.

*Id*. at 506-507 (emphasis added).

The Supreme Court held, "Congress vested the power of decision in these actions exclusively in the jury in all but the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury." *Id*. at 510.

In *Southard v. Independent Towing Co.,* the Third Circuit emphasized this proposition in the context of Jones Act claims, holding:

> [I]n a Jones Act case, a trial court can direct a jury verdict against a plaintiff only in those **extremely rare instances where there is a zero probability**

> **either of employer negligence** or that any such negligence contributed to the injury of the employer…**Issues of negligence in a Jones Act suit are questions for the jury to determine, and the jury plays a preeminent role in Jones Act cases**.

453 F.2d 1115, 1118 (3d Cir. 1971) (citing *Pehowic v. Erie Lackawanna Railroad Co*. 430 F.2d 697-700 (3rd Cir. 1970)) (emphasis added).

In the context of asbestos litigation in Jones Act cases, the "featherweight" standard of causation is also applicable. *See Torrejon v. Mobil Oil Co*., 876 So. 2d 877, 891 (La. Ct. App. 2004). In *Torrejon*, the Louisiana Fourth Circuit Court of Appeals provided a helpful two-step analysis outlining the differences between asbestos exposure claims under the Jones Act versus typical asbestos product liability claims. First, in a products liability case, the plaintiff is required to prove exposure to a particular manufacturer's products; whereas, in a Jones Act case, the plaintiff is only required to prove general exposure to asbestos aboard the employer's vessel. *Id*. Second, in a products liability case, the plaintiff is required to prove substantial causation; whereas, in a Jones Act case, the plaintiff is only required to prove slight causation. *Id.*

Accordingly, an asbestos plaintiff need only provide featherweight evidence, whether direct or circumstantial, to create a "reasonable inference" that the plaintiff's exposure to asbestos aboard a defendant's vessel was "a" cause of the plaintiff's injury. *Id*. at 893 (noting that a reasonable inference is "one that makes the existence of the inferred fact more probable than not[.]") (internal citations omitted). Indeed, the fact that circumstantial evidence is sufficient to establish causation under the Jones Act is well-settled. In *Rogers*, the Supreme Court held the burden of the employee is met, and the obligation of the employer to pay damages arises, "when there is proof**, even though entirely circumstantial**, from which the jury may with reason make that inference." *See* 352 U.S. at 508 (emphasis added).

Plaintiff also directs this Court to the reasoning found in *Badamo v. Chevron U.S.A. Inc*., 602 F. Supp. 3d 646 (S.D.N.Y. 2022). As will be shown below, the *Badamo* decision is helpful because: (1) it came from this Court, (2) the facts present in *Badamo* and this case are nearly identical, and (3) even the experts and their opinions are the same. The *Badamo* court reviewed the history of the Jones Act and its relaxed featherweight causation standard, citing many of the cases and language found above. *Id*. at 659-661.

The *Badamo* court held that even though Badamo did not give direct deposition testimony of his specific exposure to asbestos on Chevron's vessels, there was enough circumstantial evidence to create genuine issues of material fact about his exposure to asbestos on Chevron's ships. *Id*. at 661. The general testimony about Badamo's job duties as an engine room worker and about how exposure occurred everywhere in the engine room regardless of position was critical evidence. *Id*. This coupled with other exposure evidence and expert reports (which are nearly identical in this case) was sufficient to "support at least a circumstantial case that Badamo was exposed to asbestos on the Chevron vessels and to defeat Chevron's motion for summary judgment." *Id*. at 662. Plaintiff submits that for the same reasons the summary judgment motion in *Badamo* was denied, this Court should also deny Defendant's motion for summary judgment.

## C. MARITIME EXPOSURE TO ASBESTOS, IN GENERAL AND IN SPECIFIC TO MR. KELLER

### 1. The United States Coast Guard has Detailed Exposure to Asbestos for Engine Room Workers like Mr. Keller.

According to the United States Department of Transportation, United States Coast Guard, "All vessels have some asbestos insulation material on board." *See* United States Department of Transportation, United States Coast Guard Navigation and Vessel Inspection Circular No. 5-80, **Exhibit 3** to Clark Decl., published in 1980, at page 2, Section 3. According to the body of government in authority over the Defendant's vessels, "all vessels" had "asbestos insulation on

board." *Id.* The United States government issued this Circular (commonly referred to as a "NAVIC") in March of 1980 and specifically addressed it to the nation's shipping community (the Defendant). The NAVIC is important because it details the historical conditions aboard the Defendant's steamship vessels where Mr. Keller worked.

This NAVIC existed to recommend "Procedures for Control of Asbestos Hazard on Board Merchant Vessels." *Id*. at 1. It primarily sought to protect people like Mr. Keller by "controlling potentially hazardous exposure to airborne asbestos fibers by crewmembers on board merchant vessels." *Id*. The NAVIC recounted the history of asbestos in the shipbuilding industry, noting: "In the past four decades asbestos has been used for a great number of purposes with two-thirds of all asbestos being used in the construction and shipbuilding industries." *Id*. The NAVIC further stated that "major uses of asbestos" included "asbestos cement products, fireproofing, thermal insulation, asbestos cloth, brake lining, and gasket material." As will be shown, Mr. Keller's coworkers offered testimony regarding Mr. Keller's significant exposure to asbestos as an engine room worker. The NAVIC also stated that those exposed to asbestos can expect to be diagnosed with "lung cancer" as a result of exposure to asbestos. *Id*. at 1-2. There is no dispute that Mr. Keller was diagnosed with lung cancer and that asbestos exposure causes lung cancer.

The 1980 NAVIC detailed how "asbestos fibers" were released into the air "due to the motion of a vessel working in a seaway." *Id*. at 2. The NAVIC described this type of exposure as a "major concern." *Id*. The NAVIC also added that "especially in the engine room spaces," that there were "significant amounts" of asbestos found there. *Id*. This too was noted as an area of "major concern." *Id*. The NAVIC specified that "Scientific research and experience has shown that asbestos repair operations and removal or rip-out operations conducted on board ship . . . will most likely exceed" permissible limits. *Id*. at Section 4.d.(1), on page 3.

The 1980 NAVIC ended by examining the most "FREQUENTLY ENCOUNTERED ASBESTOS CONTAINING MATERIALS." *Id*. at Enclosure 5, page 12. Listed first was "Asbestos Thermal Insulation." *Id*. The list also included "Asbestos engine exhaust insulation" and "Asbestos valve packing." *Id*. The NAVIC reminded its readers (the Defendant) in its closing remarks that "Asbestos containing material is believed to have been installed on all types of vessels." *Id*. at p. 4. The NAVIC was also clear that engine room workers (like Mr. Keller) had particularly heavy exposures.

Seven years later in 1987, the Coast Guard issued another NAVIC, No. 6-87, attached hereto as **Exhibit 4** to Clark Decl. In this new NAVIC, the Coast Guard detailed how asbestos exposure was still a major concern and how the previous NAVIC vastly underestimated the permissible exposure limits to asbestos for an individual. *Id*. at page 2. Indeed, the entire NAVIC cautions its readers (the Defendant) about how the initial guidelines in the 5-80 NAVIC did not go far enough in reducing exposure. *Id*.

Again, the NAVIC sought to recommend "procedures for controlling" "hazardous exposure of marine personnel to airborne asbestos." *Id*. at p. 1. The NAVIC detailed how "Ships that were constructed between 1940 and 1975 used substantial amounts of asbestos." *Id*. This NAVIC echoed the previous NAVIC on this point, noting that "Asbestos materials are believed to have been installed on all types of vessels." *Id*. at p. 2, Section 4.c. The NAVIC repeated that all suspect materials on board the ship should be assumed to contain asbestos unless known otherwise. *Id*. at 2, Section 4.b. The NAVIC even acknowledged that ripping out asbestos would exceed permissible limits, "even with the use of engineering controls and work practices." *Id*. at 4, Section 4.d.13. As will be shown below, the Defendant never warned, trained, or protected Mr. Keller or his coworkers regarding the hazards of asbestos.

The 1987 NAVIC addressed an argument that defendants like ExxonMobil frequently make. Defendant argues that these asbestos materials are generally encapsulated and not prone to releasing respirable asbestos into the air. This is simply not true. The NAVIC is clear that encapsulation is impossible for "areas subject to vibration, personnel exposure, or frequent disturbance." *Id*. at 6, Section 4.h.4. "Encapsulation should not be used in areas subject to vibration. This includes most areas of a vessel, particularly the machinery spaces, fan rooms, and adjacent compartments." *Id*. The NAVIC was unconditional that respirable asbestos fibers on vessels were released all over the ship, particularly in the engine room where Mr. Keller worked.

Because the Defendant's steam vessels were constructed between 1954 and 1958, the NAVICs' historical evidence of exposure to asbestos clearly applies to them. *See* Vessel Status Cards for the Defendant's steam-powered vessels, attached hereto as **Exhibit 5** to Clark Decl. (The *Socony Vacuum* was built in 1954; the *Mobil Lube* in 1958; The *MobilGas* in 1956; the *Mobil Power* in 1957; and the *Mobil Aero* in 1959).The NAVICs coupled with the testimony from Mr. Keller's coworkers, detailed below, paint a very persuasive picture that Mr. Keller was continually exposed to hazardous amounts of asbestos on the Defendant's ships and that this caused his lung cancer.

### 2. Mr. Keller's Coworkers Detailed Mr. Keller's Specific Exposure to Asbestos on the Defendant's Ships.

Doug Palys sailed with Mr. Keller on the *Socony Vacuum* in 1980 and in 1982. Deposition of Doug Palys, attached as **Exhibit 6** to Clark Decl. at 6:23-8:6. Palys worked in the engine room on that ship as a pumpman. *Id*. Palys was extremely knowledgeable about the engine room onboard ships because he had a forty-nine year sailing career in the engine room, with twenty years spent working for Defendant. *Id*. at 34:20-38:7. Palys's extensive knowledge also came from the fact

that he worked in many different positions in the engine room. *Id*. at 42:23-43:19. Palys was a pumpman, wiper, and fireman/water tender in the engine rooms on Defendant's vessels. *Id*.

Defendant represents to this Court that Palys did not recall Mr. Keller. *See* SOF of Defendant at ¶¶ 44 and 48. This is not completely accurate. Palys said that he "sailed with him [Keller], but I don't really remember him." Clark Decl., **Exhibit 6** at 6:23-7:1. However when Palys was asked if he recalled working with the Third Engineer on the *Socony Vacuum*, he responded that "yeah," he remembered him even though he could not recall his name. *Id*. at 8:2-6. Mr. Keller was the only Third Engineer on that ship. Clark Decl., **Exhibit 2** at 87:15-88:2 and Clark Decl., **Exhibit 6** at 13:9-11. Thus, while it is true that Palys could not recall Mr. Keller's name specifically, he clearly remembered working with the Third Engineer on the *Socony Vacuum* in 1980, who happened to be Mr. Keller. It is not accurate to represent to the Court that Palys offered no testimony about Mr. Keller.

As a pumpman, Palys worked in the engine rooms primarily, but sometimes he worked on the winches on the deck. Clark Decl., **Exhibit 6** at 9:15-13:11. When working on the winches, the Third Engineer helped at times. *Id*. at 9:24-10:6. These winches had asbestos in the brake bands. *Id*. at 10:7-11. They would take the old asbestos brake bands down to the machine shop in the engine room and drill out the asbestos liners. *Id*. at 10:17-25. Palys knew the old and new liners contained asbestos because it said "asbestos" on the boxes the liners came in. *Id*. at 11:9-17. When asked by defense counsel if Palys meant "asbestos-free," Palys responded "No. 'Asbestos.'" *Id*. at 12:2-4. According to Palys, the Third Engineer was in the machine shop with Palys when this work with the asbestos brake bands was being done. *Id*. at 12:24-13:11. Palys also described how they would use air hoses in the machine shop to clear out the old materials on the asbestos brake bands. *Id*. at 48:18-49:8.

Palys also described how the Third Engineer (Mr. Keller) was exposed to asbestos by working with the pumps in the engine room. Palys testified that the cargo pumps (*id*. at 14:13-19:15) and stripping pumps (*id*. at 19:16-21:17 and 24:21-25:17) had asbestos gaskets and packing inside of them. *Id*. at 16:15-18 and 21:14-17. Palys knew it was asbestos because asbestos was the only material that could withstand the heat in the pumps. *Id*. at 21:14-17. When working with steam-based equipment, asbestos was the ***only*** material that could be used at that time. *Id*. at 21:20-24. Palys described how old asbestos gaskets would be scraped out of the pumps. *Id*. at 16:24-25. The Third Engineer, along with Palys and the First Engineer, scraped the asbestos gaskets out of the old pumps. *Id*. at 18:3-23 and 24:21-25:17. Scraping old asbestos gaskets out took up to an hour. *Id*. at 18:24-19:5. Another way they got the packing out of the old pumps was to use an air hose and blow out all of the debris that had accumulated from the scraping. *Id*. at 47:13-23. Working with the asbestos gaskets and packing was a regular occurrence on the ships, happening on multiple pumps per month. *Id*. at 14:13-16:14 and 18:24-19:15 and 22:22-24:16. Pump maintenance was a two-man job; therefore, this is how Palys knew the Third Engineer performed these duties with him. *Id*. at 24:17-24. The new gaskets that were used in the pumps also contained asbestos. *Id*. at 27:4-6.

Palys also detailed how "mud insulation" was used on the ships. *Id*. at 27:20-29:10. This mud insulation contained asbestos. *Id*. Palys knew this insulation contained asbestos because it said it contained asbestos on the packaging it came in. *Id*. It would sometimes have to be mixed with water and then applied by hand to the steam-based parts on the ship. *Id*. The application was usually 2-3 inches thick and took a couple of hours to apply. *Id*. According to Palys, the First and Third Engineers worked with this asbestos mud. *Id*.

Palys then detailed how the ceiling panels in their living quarters contained asbestos. *Id*. at 45:8-24 and 51:20-23. He knew it contained asbestos because "asbestos" was written on the panels. *Id*. Due to the ship's vibration, the screws holding the ceiling panels in place rubbed against the asbestos ceiling tiles causing dust to rain down on them. *Id*. When they woke up in the mornings, they would be covered with the dust from the "powdered ceiling panels." *Id*. Palys specifically recalled this in the Third Engineer's living quarters as well. *Id*. at 52:10-14 ("Those panels were in place until we sold the ship.").[1]

Finally, counsel for Defendant asked Palys about a sworn statement he signed in 2012. Palys Sworn Statement, attached as **Exhibit 7** to Clark Decl.:

> Q. Okay. That document states, in paragraph 3, "asbestos-containing products were used throughout the vessels described above. Dust was released from asbestos-containing products aboard these vessels. All of the workers aboard these vessels breathed in dust from asbestos products on a daily basis, frequently and regularly. This exposure occurred from working with or near, in close proximity, asbestos-containing product."
>
> Why do you say that there?
>
> A. Why do I say that—because that's the way it was.

Clark Decl., **Exhibit 6** at 44:16-45:1

Palys's sworn statement applied to Defendant's vessels. Clark Decl., **Exhibit 7**. Consistent with his testimony, Palys stated that this daily exposure to asbestos by the entire crew occurred in the engine room, crew quarters, and pump room. *Id*. The daily breathing of asbestos dust came from working with and around "Pipe Insulation," "Gaskets/Packing," "Valves," "Lagging," "Boilers," and "Pumps." As a Third Engineer on Mobil's ships, Mr. Keller was constantly exposed to asbestos. Whether waking or sleeping, asbestos dust was an inescapable fact for Mr. Keller's daily life.

[1] The Defendant's Fleet of vessels was sold a couple of years later. Clark Decl., **Exhibit 6** at 46:4-10.

Another coworker of Mr. Keller gave similar testimony regarding Mr. Keller's exposure to asbestos onboard Defendant's ships. Michael Nedvesky sailed with Mr. Keller on multiple voyages for the Defendant between 1981-1983. Deposition of Michael Nedvesky, attached as **Exhibit 8** to Clark Decl. at 7:24-8:9, 8:24-9:24, 21:2-9, and 36:20-21. Nedvesky mainly worked in the deck department during these voyages (*id*. at 10:15-17), and Mr. Keller was a third engineer (*id*. at 15:17-20).

Nedvesky focused his testimony about exposure to asbestos from pipe insulation. This insulation contained asbestos. *Id*. at 30:10-17 and 39:4-18. Asbestos dust was created when the pipe insulation rubbed off on the hangers that supported the pipes on the ship because of ship vibrations. *Id*. at 30:17-21. That asbestos dust matriculated down in the passageways, bulkheads, and decks. *Id*. at 30:20-21 and 31:10-11. The engineers (like Mr. Keller) and other engine room personnel worked on this asbestos insulation. *Id*. at 30:25-31:2. Nedvesky observed them "stripping the old insulation off of the steam pipes." *Id*. at 31:10-15. Stripping it off meant that they sometimes used scrapers to get the old asbestos insulation out. *Id*. at 31:20-23. This required the use of metal scrapers and air guns to blow it out completely. *Id*. at 32:3-8. This process created a "dust cloud." *Id*. at 32:9-12. When asked if he believed that he was exposed to asbestos during his time on the Defendant's vessels, Nedvesky declared, "Oh, I have no doubts. I have no doubts." *Id*. at 38:5-10.

Similar to Palys, Nedvesky also signed a sworn statement attesting to his and his coworkers' exposure to asbestos on the Defendant's vessels. Sworn Statement of Michael Nedvesky, attached as **Exhibit 9** to Clark Decl. Nedvesky's sworn statement revealed that "Asbestos-containing products were used throughout" the Defendant's vessels. *Id*. at page 5, paragraph 3. "Dust was released from asbestos containing products" on the Defendant's ships and

"All of the workers" on Defendant's ships "breathed in dust from asbestos-products on a daily basis." *Id*. Nedvesky noted that this exposure occurred from "Pipe Insulation," "Gaskets/Packing," "Block Insulation," "Valves," "Insulating Cements," and "Pumps." *Id.*

Finally, James Bolton, another coworker of Mr. Keller, offered his own testimony about pipe insulation on the Defendant's ships. Deposition of James Bolton, attached as **Exhibit 10** to Clark Decl. Bolton sailed with Mr. Keller (the Third Engineer on these voyages) multiple times between 1979-1982 on Defendant's ships. *Id* at 8:17-15:15 and at 21:22-22:4. According to Bolton, pipes on these ships were insulated. *Id*. at 22:5-19, 23:6-24:11. 25:1-26:8, 27:4-28:3. A normal occurrence on these ships is that people would bump into this insulation causing dust to be released. *Id*. That dust was then breathed in by "everybody aboard the ship." *Id*. As shown above, this pipe insulation contained asbestos. Because Mr. Keller was the Third Engineer on these voyages, he was constantly working in the engine room (*id*. at 21:22-22:4) and, thus, exposed to respirable asbestos fibers.

**3. Mr. Keller's Deposition Testimony Regarding Exposure to Asbestos.**

Mr. Keller, himself, gave a deposition in this matter. Clark Decl., **Exhibit 2**. During this deposition, he repeatedly stated that he did not believe or definitively know if he was exposed to asbestos on Defendant's vessels. Defendant is all too eager to point this out to the Court. What is lacking from Defendant's briefing is the explanation of ***why*** Mr. Keller believed this. According to Mr. Keller, the reason he did not believe he was exposed to asbestos was because "personnel, management" never told him that the products he was using contained asbestos. *Id*. at 116:3-24. Essentially, Mr. Keller believed management would have told him if he was being exposed to toxic substances; and because that was not being expressed to him by management, his common sense told him to "continue working as you normally would with these products." *Id*. at 116:25-117:2.

Clearly, Mr. Keller trusted his employer to protect him and warn him if he were being exposed to asbestos. That did not happen.

The evidence in this case, *supra*, shows that Mr. Keller was in fact exposed to asbestos as a Third Engineer on the Defendant's Vessels. Mr. Keller's coworkers were quite clear about this fact. Those coworkers testified that Mr. Keller was exposed to asbestos by the engine room machinery, the thermal insulation, preformed insulation, powder insulation, cloth insulation, gaskets, and packing. According to Mr. Keller, he worked extensively with each of these products. *Id*. at 118:10-119:3. Even though Mr. Keller did not know if these products contained asbestos, his coworkers testified that they did.

Mr. Keller testified that as a Third Engineer for the Defendant, he worked on engine room machinery all the time. *Id*. at 73:15-74:19. This was true whether the ships were out at sea (*id*.) or were in the shipyard. *Id*. at 119:11-121:2. This included working with thermal pipe insulation as part of his job duties. *Id*. at 117:20-118:6. Mr. Keller oversaw the "handling, maintenance and repair, installation, removal, trimming, cutting it to fit, things like that" for this insulation. *Id*. When Mr. Keller was "replacing" or "installing new" insulation, it was because the old insulation was in a "deteriorated" condition. *Id*. This pipe insulation contained asbestos, *supra*.

Not only was Mr. Keller exposed to the asbestos from directly working with this pipe/thermal insulation himself, but he was also exposed to the asbestos in this insulation when the ships were undergoing repairs in the shipyard. *Id*. 121:3-122:21 and 125:18-126:24. During his time in the shipyard, he worked 12-hour shifts and was less than 20 feet away from the shipyard workers who were working directly on the thermal insulation. *Id*. at 134:25-137:25. According to Mr. Keller, he was exposed to the thermal insulation daily. *Id*. Sometimes, he was in charge of

overseeing the thermal insulation work taking place in the shipyards for certain pieces of engine room machinery, such as the condenser heads. *Id*. at 126:25-127:25 and 140:23-141:4.

Steam leaks were also a regular occurrence on the ships. *Id*. at 128:1-22. Mr. Keller encountered steam leaks because of normal wear and tear and because steam leaks were caused by the natural movement of the ships. *Id*. This work caused him to be exposed to the thermal/pipe insulation where the steam leaks occurred. *Id*. at 128:1-131:8. There were blankets of insulation around the flanges which also had to be worked with, in addition to the thermal insulation that was disturbed during this steam leak repair. *Id*. Mr. Keller also described how these steam leaks caused him to work with mud insulation and preformed insulation. *Id*. at 142:10-21.

Steam leaks also caused Mr. Keller to work extensively with the gaskets/packing and thermal insulation. *Id*. at 132:15-133:8 and 143:15-145:6. According to Palys and Nedvesky, these products contained asbestos. Mr. Keller worked on many gaskets aboard the Defendant's vessels. *Id*. at 131:9-132:14. This included time in the shipyards where he would perform preemptive gasket work. *Id*.

While it is true that Mr. Keller did not know with certainty that he was exposed to asbestos, he was able to testify that he was exposed to multiple products while working for Defendant. It is known from the coworker evidence and the NAVICs that these products contained asbestos.

#### 4. Defendant Never Warned or Protected its Workers Against Any Toxic Hazards.

Defendant goes to great lengths to "prove" to this Court that it cannot be liable to Plaintiff because Defendant, allegedly, never committed any negligence. Defendant's brief, pages 5-6 and its SOF ¶¶ 80-87. Defendant cites to this Court that it knew in 1976 that asbestos was harmful to humans, and it created a "Personnel Protection Handling Asbestos" policy and Asbestos surveillance program for its employees. *Id*. Defendant offers that their "robust industrial hygiene"

apparatus was frequently testing the air on their ships for asbestos and other toxic substances. *Id*. Defendant states it instituted safety committees and safety subcommittees on **each** ship with the specific directive to identify and eliminate all hazardous conditions to the extent possible (and to wear masks). *Id*. And finally, Defendant claims it stopped using asbestos thermal insulation years before Mr. Keller began working on its steam-powered vessels and that Defendant used non-asbestos alternatives. *Id*. The actual evidence in this case refutes each of these assertions.

For purposes of this response, Plaintiff accepts that Defendant was aware of the dangers associated with exposure to asbestos at least by the time it promulgated its "Personnel Protection Handling Asbestos" policy in 1976. Defendant's SOF ¶80 (Exhibit 38). Plaintiff also accepts as true that Mr. Keller was a part of Defendant's asbestos surveillance program while working on Defendant's steamships, beginning in 1979 until 1983. Plaintiff's participation in this asbestos surveillance program is an admission by Defendant that Mr. Keller was exposed to asbestos aboard its ships—why else would Mr. Keller be in an "asbestos surveillance program" instituted by Defendant, Mr. Keller's employer, unless it was to monitor any changes to Mr. Keller's physical health due to asbestos exposure. Knowing that Defendant was critically aware of the dangers of asbestos exposure before Mr. Keller ever set foot on their steamships makes the following evidence difficult to reconcile with Defendant's representations to this Court.

In the preceding section, Plaintiff demonstrated that Mr. Keller was exposed to asbestos products as the Third Engineer on Defendant's vessels through the testimony of Mr. Keller's coworkers. According to his coworkers, Mr. Keller breathed in asbestos dust every day he worked in the engine room by various means (for example, by (1) working with asbestos containing products himself; (2) being around others who worked with asbestos; (3) being exposed to the asbestos dust released by the vibrating ship; and (4) being exposed to the asbestos ceiling tiles that

blanketed him in asbestos dust every day). Mr. Keller did not believe he was exposed to asbestos because he trusted his employer, the Defendant, to have warned him and have protected him if exposure to asbestos was occurring. Defendant never warned, trained, or protected Mr. Keller (or anyone else) regarding the hazards of asbestos exposure. This was negligent.

Doug Palys, in his deposition, testified to Defendant's "commitment" to safety regarding asbestos exposures. First, Defendant provided no masks to its workers; they simply "didn't have it" on the *Socony Vacuum* when Mr. Keller sailed with Palys. Clark Decl., **Exhibit 6** at 31:11-14. Furthermore, when asked about Defendant's safety measures as it related to asbestos on the 1980 *Socony Vacuum* voyage, Palys responded that there were not any safety measures in place. *Id*. at 31:7-10. The only safety procedures made aware to Palys by Defendant had to do with standard tool safety, not asbestos. *Id*. at 30:25-31:6. According to Palys, when thinking about his entire time spent with Defendant, he could not recall ***any*** safety measures instituted by Defendant to mitigate the release of asbestos fibers from asbestos-containing materials. *Id*. at 47:1-12. Defendant did not even recommend wetting down the asbestos to keep the dust down, according to Palys (*id*.) and Mr. Keller (Clark Decl., **Exhibit 2** at 138:15-20). This was an engineering method known for over 80 years to reduce airborne levels of dust. Mr. Corbin's Report, **Exhibit 11** to Clark Decl. at conclusion 8.

Palys also rebuts Defendant's contention that it was using non-asbestos insulation prior to Mr. Keller's arrival in the steam fleet. Def. Mem at 6; Def. SOF ¶80. As discussed *supra*, Palys testified he knew the brake pad liners for the winches, the "mud insulation," and the ceiling panels in their living quarters contained asbestos because the boxes or packaging said "asbestos," and "asbestos" was written on the ceiling panels. Clark Decl., **Exhibit 6** at at 11:9-17; 27:20-29:10; 45:8-24; and 51:20-23. According to Palys, it was only in the later years of his 49-year career that

Defendant switched to non-asbestos. Clark Decl., **Exhibit 6** at 22:1-2. Palys retired in 2014. *Id*. at 46:22-25.

Nedvesky's testimony about Defendant's commitment to warning and protecting its employees is similar to Palys'. According to Nedvesky, Defendant had ***no*** safety procedures in place to warn or protect its employees about the dangers associated with asbestos exposure. Clark Decl., **Exhibit 8** at 34:20-22. It is worth repeating that Nedvesky sailed on Defendant's ships in the early 1980s, long after Defendant admitted it was aware of the dangers of asbestos exposure. Paper masks were available on the ships, but their use was optional. *Id*. at 31:3-19 and 40:12-15. Nedvesky did not believe the paper masks were very effective against asbestos exposures. *Id*. at 32:19-21. The only time masks were used by some people was when the work got dusty. *Id*. at 34:9-16. But Defendant never told its employees that the asbestos dust could cause cancer. *Id*. According to Nedvesky: "They wouldn't say anything like that." *Id*. at 34:15-16. "They never" told Nedvesky that the products he was working with contained asbestos. *Id*. at 43:6-10.

As to exposure to other toxic substances, Nedvesky testified that Defendant exposed them to lead paint regularly. *Id*. at 40:23-25. Contrary to Defendant's assertions that it always worked to protect its employees from asbestos and other toxins, the evidence in this case demonstrates otherwise. Nedvesky testified that Defendant used lead paint the whole time he worked there. *Id*. at 41:15-18. This was after 1978 when the dangers of lead paint were universally known. Just like Palys, Nedvesky testified that he was never aware of any safety committee on Defendant's ships.

Plaintiff submits that there is enough evidence to demonstrate Defendant failed to warn, train, and protect Mr. Keller from exposure to asbestos. Again, the Court should look to the *Badamo* decision, published by this Court, for guidance in resolving Defendant's summary judgment motion. Like the plaintiff in *Badamo*, the Plaintiff in this case was not able to give

specific testimony of exposure to asbestos onboard his respective Defendant's vessels. However, sworn statements, direct evidence from coworkers, the NAVICs, and other circumstantial evidence was sufficient to defeat a summary judgment motion. The same reasoning applicable in *Badamo* should apply here. There are genuine issues of material fact regarding Defendant's negligence for exposing Mr. Keller to asbestos. For this reason, Defendant's motion ought to be denied.

**5. Defendant's Negligence Specifically Caused Mr. Keller's Lung Cancer.**

According to the prevailing law on specific causation in Jones Act cases for asbestos exposure, Plaintiff submits the evidence of his experts meets that bar. Plaintiff's expert, Troy Corbin, is a certified industrial hygienist, a certified safety professional, and a certified marine chemist. Clark Decl., **Exhibit 11**. After reviewing the above exposure evidence and analyzing it in the context of asbestos studies and his education, training, and background, Mr. Corbin arrived at several conclusions. *Id*. According to Mr. Corbin, Mr. Keller "received significant asbestos exposures while sailing as a merchant mariner…." *Id*. at page 7. Mr. Corbin held this opinion because the studies showed that workers who engaged in the activities that Mr. Keller engaged in were exposed to asbestos fibers at levels much higher than the permissible exposure limits set by the government.

One of those studies noted that engine room workers present during the removal of the thermal insulation lagging around the pipes and machinery were exposed to asbestos, on average, 880 times above the permissible exposure limits *per incident*. *Id*. at page 4. The permissible exposure limit for asbestos is 0.1 fibers per cubic centimeter (hereinafter "cc"). This study measured the concentration of asbestos fibers in the air from anywhere between 0.16-302 fibers per cc, with the mean at 88 fibers per cc. *Id*. The study also measured asbestos exposure in the "breathing zone" and determined those exposures were even higher, with an average of 91 fibers per cc, which is 910 times above the permissible exposure limit. *Id.* The samples indicated

exposures ranged between 2 and 490 fibers per cc, or 20 to 4,900 times above the permissible exposure limit. *Id.*

Mr. Corbin acknowledged the evidence showed that Mr. Keller had this type of exposure to asbestos from the thermal insulation around pipes. *Id*. Based on that evidence, Mr. Corbin stated that Mr. Keller received "similar asbestos dust exposures" from working with the pipe insulation. *Id*. This exposure to asbestos was "significant" in Mr. Corbin's opinion. *Id*. at page 5. Mr. Corbin ended his report with several opinions, all of which are relevant here:

> 1. Lung cancer and mesothelioma are caused by exposure to asbestos.
>
> 2. The health hazards of asbestos have been known for over ninety years.
>
> 3. Asbestos is a common component of many materials and items aboard vessels. Many of these asbestos-containing materials release asbestos fibers during routine ship operations as well as during maintenance.
>
>    These fibers may be circulated by the ship's ventilation systems into other areas of the vessel. Seamen also transported asbestos fibers on their clothing throughout the ship and into common living spaces (laundry, galley, lounge) and their staterooms.
>
> 4. Mr. Keller's roughly 34 years as a Merchant Mariner in the engine department exposed him to asbestos from various common materials aboard ships. These exposures were enough to increase his risk of developing lung cancer or mesothelioma.
>
> 5. There is no known safe level of exposure to asbestos when related to cancer.
>
> 6. Occupational Exposure levels are set to prevent asbestosis and allow for current common measurement methods, not cancers.
>
> 7. Occupational Exposure limits are based on 8-hour workdays, 40-hour work weeks. Seamen aboard vessels have the potential for asbestos exposure 24 hours per day for weeks at a time.
>
> 8. Protective control methods to prevent or minimize exposures to asbestos have been known for over eighty years.

*Id*. at page 7. As the Court can plainly see, Mr. Corbin offered evidence, if viewed in the light most favorable to the Plaintiff, that Defendant exposed Mr. Keller to asbestos at such levels as to

increase his risk of developing lung cancer. *Id*. This coupled with the evidence from Dr. Kradin is enough to show that Defendant's negligence specifically caused Mr. Keller's lung cancer.

Dr. Kradin is Plaintiff's specific causation expert. Dr. Kradin is board certified in several disciplines, with a specialty in pulmonary pathology. Dr. Kradin's Report, **Exhibit 12** at page 1 to Clark Decl. Dr. Kradin has authored over 200 articles regarding asbestos, and he directs post-graduate work at Harvard Medical School regarding asbestos diseases. *Id*. at 1-2. Studies linking lung cancer with asbestos exposure began appearing in the medical literature in the 1950s. *Id*. at 2. Since that time, the studies have shown that low levels of exposure to asbestos cause lung cancer.

Dr. Kradin reviewed the coworker deposition testimony regarding Mr. Keller's asbestos exposures noted above. *Id*. at page 4. Based on Mr. Keller's exposure to asbestos (as detailed in the summary of Mr. Keller's coworkers' testimony *supra*), Dr. Kradin opined within a reasonable degree of medical probability that exposure to asbestos while working on the ships caused Mr. Keller's lung cancer. *Id*. at page 5. The testimony of Plaintiff's experts further demonstrates Defendant's negligence (exposing Mr. Keller to asbestos without warning him, training him, protecting him, or otherwise acting reasonably and prudent) specifically caused Mr. Keller's lung cancer. Therefore, under the prevailing law, viewing the evidence in the light most favorable to the Plaintiff, Defendant's summary judgment motion ought to be denied in its entirety.

### 6. Defendant's Attacks on Plaintiff's Experts Go To the Weight of Their Opinions, Not Their Sufficiency.

Defendant spends much of its time attacking Plaintiff's experts for reasons that are outside the scope of summary judgment.[2] For example, Defendant attacks Mr. Corbin because he allegedly

[2] Defendant also filed three separate *Daubert* motions to exclude each of Plaintiff's experts: Arnold Brody, Ph.D. (Dkt. Nos. 24-26); Troy Corbin, CIH, CSP (Dkt. Nos. 33-35); and Richard Kradin, M.D. (Dkt. Nos. 27-29). Plaintiff filed Responses in Opposition to each of these motions concurrently with this Response. Defendant's arguments for the exclusion of Plaintiff's experts are largely duplicated in its motion for summary judgment. Therefore, for the sake of brevity, Plaintiff incorporates his Responses in Opposition to Defendants Motions to Exclude Arnold Brody, Ph.D., Troy Corbin, CIH, CSP, and Richard Kradin, M.D. as if fully set forth herein.

did not quantify Mr. Keller's exposure (he did) and because Mr. Corbin relied on studies that are allegedly irrelevant (they are not). These avenues of attack on Mr. Corbin go directly to the weight of his opinions, not their sufficiency. If Defendant would like to assail Mr. Corbin on the stand at trial on these bases, Defendant is free to do so. But those are not bases from which this Court can decide a motion for summary judgment. Mr. Corbin's opinions are to be taken in the light most favorable to Plaintiff, and those opinions are clear that Defendant exposed Mr. Keller to asbestos at unsafe levels.

Likewise, Defendant's attack on Dr. Kradin is also not appropriate to be resolved by a summary judgment motion. Defendant attacks Dr. Kradin because he allegedly holds opinions contrary to the law that each and every exposure to asbestos causes lung cancer. This is not Dr. Kradin's opinion. Rebut from Kradin's Daubert response.

Finally, Defendant attacks every expert of Plaintiff's because each of them never took radon into account as being causative of Mr. Keller's lung cancer. Rebut with material from Daubert responses.

## CONCLUSION

Plaintiff respectfully requests the Court to deny Defendant's motion in its entirety and award any other such relief to Plaintiff that is appropriate.

Dated: June 5, 2024.

Respectfully submitted,

**MOTLEY RICE LLC**

*/s/ Meredith K. Clark*
Meredith K. Clark, Esq.
John E. Herrick, Esq., *pro hac vice*
Donald Migliori, Esq.
28 Bridgeside Blvd.
Mt. Pleasant, S.C.
(843) 216-9000
F: (843) 216-9450

mkclark@motleyrice.com
jherrick@motleyrice.com
dmigliori@motleyrice.com

Timothy A. Swafford, Esq.
JAQUES ADMIRALTY PC
30800 Telegraph Road, Suite 1850
Bingham Farms, MI 48025
Phone: (313) 961-1080
Fax: (313) 961-5275
tswafford@jaquesadmiralty.com

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2024, a true and correct copy of the foregoing, Plaintiff's Response in Opposition to Defendant ExxonMobil Oil Corporation's Motion for Summary Judgment, was filed with the Court and served electronically this day and is available for viewing from the Court's ECF (Electronic Case Filing) system to all counsel of record and to those registered to receive a Notice of Electronic Filing for this case.

Notice of this filing will be sent to all counsel of record via the Court's ECF system.

/s/Meredith K. Clark
Attorney for Plaintiffs

Meredith K. Clark
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9000
(843) 216-9450 (fax)
mkclark@motleyrice.com